Memorandum of Decision
CT Page 810
On February 2, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Redora B. and Donald L. to their daughter, Aneesah B. A trial of the termination petitions took place on December 9, 10 and 29, 1998.[2] For the reasons stated below, the Court denies the petition to terminate parental rights.
FACTS
The Court finds the following facts and credits the following evidence.
 A. Procedural Background
Aneesah B. was born on May 4, 1996 at twenty-nine weeks gestation testing positive for cocaine. DCF obtained an order of temporary custody of Aneesah on June 3, 1996. On July 10, 1996, the Court adjudicated Aneesah to be neglected and uncared for and committed her to DCF custody for one year. The Court has annually extended the commitment, which next expires on July 1, 1999. As stated, on February 2, 1998, DCF filed its termination petition. On October 7, 1998, the mother admitted the statutory ground of failure to rehabilitate, see Conn. Gen. Stat. §17a-112(c)(3)(C), and agreed to contest only the dispositional phase of the termination case.
 A. The Mother
Redora B. was thirty-one years old at the time of trial. At age fourteen she had a spinal fusion due to scoliosis and had a rod placed in her back. She continues to experience back pain. Although the mother dropped out of high school, she obtained a GED and completed one and one-half years of college.
The mother has a long history of substance abuse and criminal convictions. DCF was involved with her two older sons from prior relationships. The mother lost parental rights to one of the two boys through termination proceedings. The mother began a nonmarital relationship with the father in late 1995. The relationship was marred by drugs and domestic violence. At the time of Aneesah's birth, the relationship was in shambles.
After Aneesah's placement in her first foster home in June, CT Page 811 1996, DCF made unsuccessful efforts to contact the mother. The mother failed to attend the commitment hearing and so the Court did not have the opportunity to impose initial expectations. In late July or early August, however, the mother called DCF from the York Correctional Institute in Niantic, where the mother was detained on prostitution charges. On August 21, 1996, the DCF social worker assigned to the case went to the prison with Aneesah, explained to the mother what DCF expected her to do to rehabilitate herself, which centered on drug rehabilitation, and set up a weekly visitation schedule to commence on August 30, when the mother was expected to be released.
Over the next twenty months, until the late spring of 1998, the mother failed to reestablish herself as a possible placement for Aneesah. The mother missed a number of scheduled visits with Aneesah and her whereabouts became unknown for two periods of several months each. The mother was incarcerated again in October, 1996 and February, 1997 on charges of prostitution, failure to appear, and violation of probation. Although the Court entered expectations in July, 1997 that focused on drug rehabilitation, the mother failed to complete several substance abuse programs, and struggled with homelessness and sobriety. Toward the end of this period, the mother became pregnant through a different relationship. Some of the visits that the mother missed in 1998 resulted from the fact that this pregnancy was one of high risk, thus necessitating frequent medical appointments and some hospitalization.
On March 5, 1998, the mother gave birth to a healthy boy named Kahlil. This event seems to have changed the direction of the mother's life. The mother completed a program geared toward teaching parenting to women with substance abuse problems and then completed a job training program. The mother now has a job as a supervisor and has a day care arrangement for Kahlil. The mother found an apartment to share with another mother and then found her own three room apartment. The mother has been drug-free and sober for over a year. She attends Alcoholics or Narcotics Anonymous every day. In its December 7, 1998 Addendum to the Social Study, DCF "acknowledge[d] that [the mother] is making steady progress in her substance abuse treatment program and in meeting the needs of her son whom she has parented from birth."
During 1997, many of Aneesah's visits with her mother went well, although there were also times when Aneesah would cry when going to a visit. The mother's visits with Aneesah resumed on a CT Page 812 regular, biweekly basis on April 30, 1998. Since that time, the visits have been uniformly positive. Aneesah is happy to see the mother, whom, along with her new foster mother, she calls "mommy."[3] Aneesah loves to be a big sister to Kahlil, whom the mother brings to the visits. The mother reads to Aneesah and gets down on the floor with her to play. The mother has brought nutritious foods for snacks, child-appropriate videos to watch, and toys and clothes for Aneesah to bring back to her foster home. As DCF has stated in its Social Study Addendum: "[The mother] is patient and thoughtful during visits with her daughter and enjoys playing with her." The mother testified credibly that she would be willing to work with DCF in effectuating a smooth, gradual return of Aneesah to her home and that she would regard Aneesah's current foster parents as part of their extended family.
 C. The Father
The father, Donald L., was thirty-five years old at the time of trial. He was honorably discharged from the U.S. Army in 1983. He has four children from a prior marriage. He has supported them and there is no history of DCF involvement in their lives.
The father, however, has a long history of drug abuse. In 1989, he was convicted of two felonies. When the father began his relationship with the mother in late 1995, the father was attempting to address his drug problem. He relapsed in April, 1996 and the relationship fell apart.
The father visited Aneesah virtually every day that she was in the hospital, although on one occasion he got into an altercation with the mother. The father then failed to attend the custody and commitment hearings. DCF did not hear from the father until September, 1996, when the father called DCF from a drug program that he was attending. The father met initially with the social worker who explained that, because there was uncertainty about paternity, a paternity test was necessary before they could take the next step of arranging visitation and services. The father agreed with the idea of a paternity test because he knew that the mother had engaged in prostitution.
The father, however, failed to keep a follow-up appointment with DCF. The father, at the time, was addressing his drug problem and his homelessness. He did not call DCF again until early January, 1997, when he requested visitation with Aneesah. CT Page 813 The DCF worker reiterated the need for a paternity test but nonetheless arranged a visit with Aneesah for January 16. The father did not appear because on that same day he went to jail for twenty days on failure to appear charges.
In April, 1997, DCF sent a letter to the father, at two different addresses, requesting that he contact them. The father's mother received one of those letters and advised the father that he had some mail, but the father did not pick the letter up until June. The father, to be sure, was working twelve hour days with six additional hours of commuting on public transportation until June, 1997. The father, in the meantime, had moved in with his fiance, Sherry H., who was pregnant with his child. Sherry received several phone calls from DCF about the case, but the father only attempted to contact DCF once. The father's main concerns at the time were finalizing the divorce from his first wife, marrying Sherry H., which he did on August 4, 1997, and having their baby boy, who was born on September 19, 1997.
DCF sent another letter to the father, care of his mother, in January, 1998, this time advising the father that DCF was filing a petition for termination. It is not clear whether the father ever received this letter. In any event, the father did not contact DCF again until June, 1998. At that time, the father again requested to see Aneesah. He explained that he now was married, had his own fence installation business, and had a decent place to live. DCF again asked the father to take a paternity test. After missing the first appointment, the father took the test, which confirmed that he is Aneesah's father. The father, however, has not seen Aneesah since her birth.
The father testified at trial that he was ashamed of his substance-dependent past. He explained his failure to see Aneesah by citing his need to rehabilitate himself personally and support his other children. The father now has been substance-free for over two years. He has stabilized himself with a good marriage, a successful business, and a new four bedroom home. The father supports his children from his previous marriage, has taken in one of his wife's children from her previous marriage, and, along with his wife, is raising his new son, Dante. The father practices the Muslim religion. Commendably, the father testified that he had no anger toward DCF and that DCF was there when needed at the time of Aneesah's birth. He feels now, however, that he can provide a natural parent's love for Aneesah. CT Page 814
 D. Aneesah
Because DCF originally placed Aneesah in a Spanish-speaking bilingual home, Aneesah began to say some of her words in Spanish. Aneesah spent the first two years of her life in this foster home and began to bond with the foster parents. In 1998, once DCF made the decision to seek termination, DCF began to look for a new home for Aneesah that could serve as an adoptive home and also raise Aneesah in the Muslim religion, in keeping with the mother's placement request at the outset of the case. On May 5, 1998, following a period of visitation and careful transition, DCF placed Aneesah in a new foster home that met its criteria.[4]
Aneesah has adjusted and thrived in her new home. According to a December, 1998 report, Aneesah's progress in social interactions, language skills, attention and play skills, and coping abilities has been "dramatic during the past six months." Despite her predicament at birth, Aneesah now has no developmental delays and no special needs.
Aneesah has formed a close and caring relationship with her new foster parents, who share Aneesah's full-time care. The foster parents also take care of a four year old niece in the morning. DCF would like to see the foster parents adopt Aneesah. The foster parents did not testify at trial. The most recent psychological evaluation of them and their interaction with Aneesah was conducted on May 26, 1998, shortly after Aneesah began living with them.
Aneesah is now two and one-half years old. She is a happy, friendly, outgoing child. Undoubtedly some of her happy disposition stems from the fact that she has received a high quality of care from the DCF workers and the foster parents in this case.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that CT Page 815 the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). The Court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. On July 1, 1998, at a commitment extension hearing, the Court made the requisite finding that further efforts to reunify the parents with Aneesah are not appropriate.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in § 17a-112(d).[5] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus February 2, 1998.
As stated, the mother has acknowledged that she has failed to rehabilitate within the meaning of § 17a-112(c)(3)(C). With regard to the father, DCF alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship. At the conclusion of trial, DCF withdrew the ground of lack of an ongoing parent-child relationship. DCF alleges that the remaining two grounds concerning the father have existed for more than one year. The Court finds that DCF has proven these allegations by clear and convincing evidence.
 1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, CT Page 816 concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
The reality in this case is that the father has not seen Aneesah her since her birth in May, 1996. There is no evidence, moreover, that he has sent her any cards or gifts, or recognized any of the special days in her life. The father failed to attend most of the Court hearings in this case and the father only contacted DCF sporadically. Indeed, the father failed until just recently to take the initial step of establishing his paternity, even though the father agreed that a paternity test was necessary in this case. It is true that the father was attempting to get his own life in order throughout this time and that he expresses a strong interest in Aneesah now. The father unquestionably faced some difficult life decisions during this period. The fact remains, however, that he chose his personal rehabilitation at the expense of his relationship with his daughter. As a result, the father is a stranger in Aneesah's life. The Court concludes that DCF has proven abandonment by the father.
 2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). The statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). CT Page 817
No dispute exists that the Court has previously found the child to have been "neglected," thus satisfying a statutory prerequisite. The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the statute requires the Court to "consider the age and needs of the child," id., and the Court must analyze a parent's rehabilitation "as it relates to the needs of the particular child." Luis C., 210 Conn. at 167. Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
The Court is satisfied that the father has now rehabilitated himself personally. The father has certainly come a long way from being a drug addict to being a responsible husband, father, and businessman. But personal rehabilitation is not the same as parental rehabilitation. See In re Christina V.,38 Conn. App. 214, 219-21 (1995). The statute, as discussed, requires that within a "reasonable time" after the adjudicatory date, the parent must be able to assume a "responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). A reasonable time of over ten months has elapsed since the filing for termination and the father still has not assumed any position, much less a responsible position, in Aneesah's life. The father's personal rehabilitation has come too late to establish his parental rehabilitation within the adjudicatory period. The Court finds that DCF has proven failure to rehabilitate by clear and convincing evidence.
 3. One Year Requirement
The Court finds that the statutory grounds supporting the termination of the father's parental rights to Aneesah have existed for more than one year prior to filing of the petition. Moreover, the Court can waive the one year requirement if it finds "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." Conn. Gen. Stat. § 17a-112(d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent CT Page 818 necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The Court starts by examining the two ongoing parent-child relationships that Aneesah currently has. One of those relationships is with her foster parents. This relationship is unquestionably a positive one and Aneesah has thrived in her new home. As stated, DCF would like to see the foster parents adopt Aneesah. The other relationship that Aneesah has is with her natural mother. This relationship, too, is a warm and loving one. The mother seeks Aneesah's return.
In surveying these two different roads that Aneesah's life might take, this Court must initially bear in mind that it does not now have the option of immediately returning Aneesah to her natural mother. Even given this Court's denial of the petition to terminate the mother's parental rights, Aneesah will remain committed to DCF until July 1, 1999. The mother did not file a motion to revoke this commitment.
The Court realizes, however, that denying the termination petition against the mother would lead to the possibility that Aneesah would be returned to her natural mother at the end of the current commitment. The mere possibility of such a return would deprive Aneesah of a sense of permanency and security that she deserves to have. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983). And actual return of Aneesah to Redora B. would undoubtedly cause some trauma to Aneesah, who is currently attached to very caring foster parents.
There are several factors that temper these concerns. First, because the foster parents did not testify, the Court is not certain of their commitment to adopting Aneesah. Second, as of the date of this decision, Aneesah has been with her present foster parents for approximately seven months, which is of relatively short duration. Finally, Aneesah fared very well in her transition during the spring of 1998 from her original foster CT Page 819 parents, who had Aneesah for almost two years, to her current foster parents. Although DCF argues that another move would be one too many, this argument is not convincing. Given that Aneesah tolerated her first move well, and that a return to her mother would be a return to someone she already regards as a "mommy," the Court believes that such a return would not prove overly traumatic. Any trauma, moreover, would be reduced by making the transition gradual and closely supervised, much like Aneesah's initial transition between foster homes.
The next question is whether Aneesah would benefit from her mother's care. The Court starts with the proposition that, all other things being equal, a child benefits from being raised by a biological parent. "The genetic bond shared by a biological parent and his or her child, although not determinative of the best interest of the child, is certainly a factor to consider."In re Kezia M., 33 Conn. App. 12, 22 (1993). See also Conn. Gen. Stat. § 46b-56b (presumption that parent, rather than nonparent, should have custody of child in custody disputes).
The other factors to examine center on the actual nature of the parent-child relationship. Even DCF acknowledges that it is a good one. The mother loves Aneesah and is unquestionably appropriate with her. Aneesah has affection for both her mother and her half-brother Kahlil. Aneesah now has no special needs that would require unusual parenting abilities. The mother seems to have rehabilitated herself personally.[6] The mother is willing to work with DCF in making a smooth, gradual transition and would regard Aneesah's current foster parents as part of her extended family.
In sum, it appears that Aneesah would prosper with her natural mother. Further, as discussed above, the usual trauma in separating a child from a pre-adoptive home does not seem present here. Weighing all of these competing factors, the Court simply cannot say that the case for terminating the mother's parental rights is clear and convincing. Under the applicable burden of proof, the Court cannot grant the petition against the mother.
The father's case presents an unusual situation. Ordinarily, this Court would be inclined to terminate the rights of a parent, such as the father, who abandoned his child and failed to rehabilitate within the adjudicatory period and even to this date has no relationship with his daughter. The fact that this Court has decided against terminating the mother's parental rights, CT Page 820 however, makes this a different case. The usual need to terminate both parents' rights in order to free a child for adoption does not exist here because this Court, by denying the petition to terminate the mother's rights, has in effect decided that DCF may not pursue adoption at the current time. Further, there is now a reasonable possibility that Aneesah will return to the custody of her biological mother, who is currently single. In that event, Aneesah should have the benefit of getting to know her biological father so that she can receive the sort of guidance that a child normally receives from a two biological parent family. This goal is especially meaningful given that the father has now become a responsible parent and citizen. Accordingly, the Court finds that the best interest of Aneesah do not clearly and convincingly warrant termination of the father's parental rights at this time.
The undersigned judge will remain assigned to this case to hear all subsequent matters until further notice. Given the strength of the mother's case, and the fact that she is Aneesah's biological parent, this Court would not be inclined to grant any future petition to terminate the mother's parental rights unless DCF has undertaken intensive efforts to reunify Aneesah with her mother and those efforts have failed. Those intensive efforts should include gradually increasing visitation, including overnight visitation, if Aneesah fares well. This Court would not be inclined to grant any future petition to terminate the father's rights unless DCF granted him the opportunity to visit Aneesah regularly and the visits did not go well. In addition, the father's case, as explained, is to a certain extent dependent on the status of the mother's relationship with Aneesah. This Court would also expect that the mother and father, for their part, would remain completely free of illegal drugs, not abuse alcohol, have no involvement in he criminal justice system, maintain suitable housing and employment, and continue to develop their relationship with Aneesah. A new psychological evaluation of the mother's, father's, and the foster parents' interactions with Aneesah would also prove helpful.
In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. CT Page 821
Based on the foregoing discussion, the Court finds that DCF provided foster care for Aneesah and offered the parents visitation. DCF referred the parents to counseling for substance abuse problems and parenting skills. These services were relevant to the needs of the parties and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
In July, 1997, the Court approved the following expectations for Redora B.: (1) keep all appointments set by or with DCF and keep whereabouts known to DCF and your attorney, (2) visit the children as often as DCF permits, (3) participate in counseling for parenting, individual needs, domestic violence, and substance abuse, (4) secure and maintain adequate housing and income, (5) no substance abuse, (6) no involvement with the criminal justice system, and (7) participate in a psychological evaluation. As detailed above, DCF substantially met its obligation to provide assistance. Based on the foregoing discussion, the Court finds that the mother only partially complied with these expectations prior to the filing of the termination petition. The Court did not enter expectations for the father because he did not appear in Court prior to the filing of the termination petition.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Aneesah is attached to both the present foster family and the natural mother. Aneesah does not have any emotional ties to the father. CT Page 822
5) The age of the child.
Aneesah will be three years old on May 4, 1999.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that Redora B. has now made significant efforts to adjust her circumstances or conditions to facilitate reunification and, as of April 1998, has maintained regular contact with Aneesah. Donald L. has rehabilitated himself significantly, but he did not maintain regular contact with Aneesah. For the reasons stated above, however, it is appropriate to grant the father regular visitation with Aneesah.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
The parents here did not face unreasonable interference from each other or from any third person. The parents did face severe hardship from economic circumstances caused primarily by their substance abuse. The parents, to their credit, proved that these problems can be overcome. The father, however, did so at the price of losing contact with his daughter.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is not in the best interest of Aneesah B. for a termination of parental rights to enter with respect to the mother, Redora B., or the father, Donald L. Accordingly, the Court hereby denies the petition to terminate the parental rights of Redora B. and Donald L. The undersigned judge will remain assigned to this case to hear all subsequent matters until further notice. CT Page 823
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] This trial was bifurcated due to the failure of the parties to complete the trial within their original estimate of two days. Bifurcation of a court trial imposes a hardship on the Court, which sits as finder of fact, and undoubtedly on the parties themselves.
[3] As will be discussed below, as of May 5, 1998, Aneesah has a new foster home.
[4] In June, 1998, the father expressed his approval of Aneesah's placement in a Muslim home.
[5] Effective July 1, 1998, section 8 of Public Act No. 98-241 eliminates the one year requirement. DCF does not claim reliance on this amendment, apparently because of concerns that a substantive change in the law should not apply retroactively to a petition, such as the petition here, filed before the effective date of the new law.
[6] In view of this finding, the mother's own admission that she has failed to rehabilitate herself is baffling. By admitting this ground, the mother is arguably conceding that she "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). Such an admission makes it difficult to see why her parental rights should not be terminated. In view of her testimony at trial, in which she vigorously opposed termination, the Court is convinced that the mother did not understand all of the logical consequences of her initial admission. At closing argument, in fact, counsel for the mother acknowledged that she now had "misgivings" about having her client admit this ground. For these reasons, the Court will accept the mother's admission for purposes of satisfying DCF's burden of proving a statutory ground, but does not feel bound by the logical consequences of that admission in resolving the dispositional phase of the case.
CT Page 824